Filed 2/24/15  P. v. Pawlicki CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>PATRICK STANLEY PAWLICKI,<br><br>    Defendant and Appellant. | D063728<br><br><br><br>(Super. Ct. Nos.<br>SCD223454/SCD237383) |

APPEAL from a judgment of the Superior Court of San Diego County, Louis R. Hanoian, Judge.  Affirmed.

Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Anthony Da Silva, Deputy Attorneys General, for Plaintiff and Respondent.

The jury convicted defendant Patrick Stanley Pawlicki of lewd acts upon a child under 14 years old (Pen. Code,[1] § 288 subd. (a)) as follows:  with respect to victim Christina C., the jury found defendant's hand touched Christina C.'s breast (count 1); his hand touched Christina C.'s vagina (count 2); his penis touched Christina C.'s hand (count 3); and his penis touched Christina C.'s vagina (count 4).  With respect to victim Bonnie P., the jury found defendant's penis touched Bonnie P.'s genital area while they were in the bathroom (count 6) and his hand touched Bonnie P.'s crotch while they were in a truck (count 8).[2]  Finally, with respect to victim Michael S., the jury found defendant's penis touched Michael S.'s anus (count 7).

The jury found true the allegations that defendant committed the lewd acts while the victims were under 18 years old and the commencement of the criminal action occurred before the victims' 28th birthdays (§ 801.1, subd. (a)); that defendant had substantial sexual conduct with each victim (§ 1203.066, subd. (a)(8)); and that the offenses were committed against more than one victim (§ 667.61, subds. (b), (c) & (e)).  The trial court sentenced defendant to a term of 105 years to life in prison.

Defendant contends his conviction must be reversed because (1) he allegedly received per se ineffective assistance from his retained counsel; (2) the court abused its discretion and thus erred when it denied his request on the eve of trial to substitute in new counsel for a *tenth* time, after trial had been continued multiple times over a three-year

---

[1]     Unless noted otherwise, all further statutory references are to the Penal Code.

[2]     The jury found defendant not guilty on count 5, which alleged defendant's hand touched Bonnie P. while in defendant's bed.

period and after his new proposed counsel stated she was *not* then prepared to start trial and needed yet *another* trial continuance; and (3) the court violated his due process and equal protection rights when it admitted under Evidence Code section 1108 evidence of other sexual offenses he allegedly committed. Affirmed.

## OVERVIEW[3]

A. *Factual Summary*

Tammy S., the mother of Christina C. and Michael S., met defendant in 2003 through a Christian mingle Internet site. Christina C. was then 12 years old and her brother Michael S. was then 11 years old. The family lived in Ohio, where Tammy S. received public assistance because of a brain disability.

Tammy S. and her two children came to San Diego to meet defendant in April 2003. Defendant met the family at the airport and immediately proposed marriage to Tammy S. The family stayed at defendant's house, located in Santa Ysabel, for about a week. Also then living at defendant's house were his two children from another relationship, Bonnie P., then aged nine and Aaron P., then aged 10. Bonnie P. was born with Down syndrome and, according to her birth mother and defendant's former wife, Lucie P., Bonnie P. functioned at the level typical of a three- to seven-year-old child. Lucie P. lived with her partner in a separate house on defendant's property.

---

[3] We view the evidence in the light most favorable to the judgment. (See *People v. Osband* (1996) 13 Cal.4th 622, 690.) Portions of the factual and procedural history related to certain of defendant's contentions are discussed *post*.

3

During their initial week-long visit with defendant, Christina C. testified she, her mom (i.e., Tammy S.), Bonnie P. and defendant all slept in the same bed in defendant's bedroom. Each night defendant slept next to Christina C. Bonnie P. slept on the other side of defendant and Tammy S. slept next to Bonnie P. (but not defendant). Christina C. stated they all slept in the same bed because it was cold outside and the bedroom was the only room heated.

Christina C. testified that on the second or third night of their visit, defendant touched her breasts and vagina. Christina C. did not then tell her mother about the touching because her mother seemed happy to be with defendant and because defendant told Christina C. not to tell anyone. When the visit ended, Tammy S. and her two children returned to Ohio to plan Tammy S.'s wedding to defendant and their permanent move to California.

Tammy S. and defendant married in Las Vegas in November 2003. Also present at the wedding was Christina C., Michael S., Bonnie P., Aaron P. and one of defendant's friends, Brad Holt.

Christina C. testified after her mother and defendant married defendant continued to touch Christina C. in the vaginal and breast area. The touching occurred in the nighttime in the bed in defendant's bedroom. According to Christina C., the touching began about a week after the wedding, and she estimated defendant touched her sexually thereafter three or four times a week. Defendant's touching consisted of rubbing Christina C.'s breasts under her clothing, skin-to-skin, and putting his hand down her pants and rubbing her vagina and the inside of her vagina, skin-to-skin. Defendant also

4

grabbed Christina C.'s hand and put it on his penis. Christina C. testified this touching was "common."

Christina C. testified the touching escalated into intercourse, including when her mother, Tammy S., was present in the room. Defendant also kissed Christina C. while touching her. About a month after the wedding, defendant told Christina C. that she was a better wife to him than her mother. Defendant also told Christina C. that she was "good with [her] hands." Christina C. said she felt "dirty" when defendant touched her or made her touch him; that she did not then tell her mother about any of defendant's touching because her mother would not believe her; and that she did not know if her mother knew about defendant's touching because her mother often slept on the couch in the living room.

Christina C. also testified that sometimes defendant would roll over and she could feel "movements" between defendant and Bonnie P. Christina C. described how defendant also would take Bonnie P. into his bedroom, lock the door and then come out of the room about 20 minutes later in his underwear. Christina C. said it was "common" for defendant to take Bonnie P. into his bedroom alone. Christina C. saw defendant put his hand up Bonnie P.'s skirt, into her vaginal area, when they were in defendant's truck on their way to school.

Christina C. testified defendant made sexual comments about her in her presence and in the presence of others. For example, she testified defendant said, "I'm good with my hands, just ask Crissy" (i.e., Christina C.) when they were at a restaurant. Christina C., Tammy S., Michael S., Bonnie P., Aaron P. and Lucie and her partner were present

5

when defendant made this comment. Christina C. understood this comment to reference defendant's touching of her at night. In response, Christy C. called defendant an "idiot." According to Christina C., her mother did not respond to defendant's comment.

Around this same time, defendant asked Christina C. if she carried condoms in her purse and, as noted, commented, including in front of Tammy S., that Christina C. was a better wife than her mother. According to Christina C., her mother said nothing when defendant made such comments. Defendant also commented that Christina C. had a " 'nice butt' " after he made her and Bonnie P., but not the boys, pull down their pants (including underwear) when punishing them with a belt.

At some point, Christina C.'s maternal grandmother needed surgery. As a result, Tammy S. took Christina C. and Michael S. back to Ohio to live. Christina C. testified defendant did not stop touching her until they moved back to Ohio.

Michael S. testified he was 11 years old in 2003 when his mother, Tammy S., married defendant. Michael S. testified shortly after they moved in with defendant he heard noises similar to crying coming from defendant's master bathroom. When Michael S. walked inside the bathroom, he saw Bonnie P. "bent over" the toilet. Defendant was standing behind Bonnie P. and his penis was penetrating Bonnie P. Michael S. was "shocked" and stood "frozen" when he saw defendant having intercourse with Bonnie P.

Michael S. testified defendant hit him on the back with a belt buckle as he tried to walk away from defendant. Michael S. fell to the ground. Defendant next put his forearm under Michael S. shoulder, pressed Michael S.'s face against the floor and got on top of Michael S. Defendant next pulled down Michael S.'s pants and inserted his penis

6

into Michael S.'s rectum. Michael S. testified it hurt. Defendant continued to penetrate Michael S. for what seemed like "forever," then finished, and said, " 'Just don't speak of anything.' " After defendant left, Michael S. went to check on Bonnie P. Michael S. did not then tell his mother about the attack because he was embarrassed.

The record shows defendant bragged to others about having sexual contact with Christina C. For example, when defendant and Justine C., a relative of defendant's former wife Lucie P., were alone in defendant's house, defendant told Justine C. that Tammy S. "made" him have sex with her daughter Christina C.

Justine C. also testified when she was about 10 or 11 years old, she and her "little cousin," who was not yet old enough to walk, were in defendant's bedroom when defendant showed them "porn" on the television. According to Justine C., when they were all sitting on defendant's bed he put on a video of two naked "girls doing sexual things." On another occasion defendant told Justine C. he secretly set up a video camera to catch Lucie and her partner, who, as noted, lived in a separate house on the same property, having sex.

Neighbor Todd Fichter testified that defendant talked about sex each time they were together, including in front of Fichter's wife; that defendant asked Fichter if he and his wife ever came to defendant's house at night and looked through the window to watch defendant and his new wife (not Tammy S.) having sex; and that on one occasion, defendant came unannounced to Fichter's house early in the morning and when Fichter said during their conversation that he had once lived with a former girlfriend who had a

7

teenage daughter, defendant responded, "Are you into little girls? Are you into your own girls?"

With respect to this last conversation, Fichter testified that defendant talked about an "ex-girlfriend" from Ohio who had a daughter. Defendant said that the "mother and her daughter" both slept in his bed; that when they were all sleeping in the bed together someone touched him, which caused him to become sexually aroused; that he began to touch the person back, including "her breasts," and they engaged in sexual intercourse; and that when he opened his eyes he realized he had intercourse not with his "ex-girlfriend," but instead with her 12-year-old daughter.

Fichter testified that defendant described this incident in a "sickening, sadistic way" and that defendant was smiling from "ear to ear" as he told the story. According to Fichter, defendant made it clear he was "proud" to have had sexual intercourse with a 12 year old. Defendant also told Fichter during this same conversation that it was the "best sex ever" and the experience opened up his eyes to having sexual encounters with "younger women."

The record shows defendant also told his dentist and friend from high school, Michael Bradbury, that he was "very interested in mother-daughter sex relationships." Defendant told Dr. Bradbury he had married a woman from Ohio and, according to Dr. Bradbury, defendant was "giddy and happy and arrogant" about the fact this woman, who Dr. Bradbury later met, had a daughter. Dr. Bradbury testified defendant talked to him about having sex with a "variety of women," including Lucie's partner, who defendant said he wanted to "fuck." Defendant also told Dr. Bradbury in or around 2002

8

or 2003 that he wanted to grab Dr. Bradbury's wife's "tits," which led Dr. Bradbury to reprimand defendant.

Dr. Bradbury's wife, Rhonda Bradbury, testified that when Tammy S. and defendant were married Tammy S. came to the dental office for treatment. At some point later in time, after defendant met his then "new" wife, defendant told Rhonda that his marriage to Tammy S. had been short; that he sent Tammy S. back to Ohio because she was "lazy"; that her daughter (i.e., Christina C.) "had inappropriately revealed herself sexually to his son Sean"; and that Christina C. had "slipped" into bed with he and Tammy S. one night and he believed he was having sexual intercourse with Tammy S. when it turned out to be Christina C. Rhonda testified that defendant made it known he enjoyed the "mistake" and that, in her view, defendant knew it was not a "mistake" as he enjoyed having sexual intercourse with Christina C.

Defendant also told his friend and business partner, Brad Holt, about an incident when he was in bed with Christina C. and Tammy S. Holt testified that defendant said he was awakened when "somebody" began to fondle his penis. Defendant told Brad he initially thought it was Tammy S. touching him but then realized it was Christina C.

Defendant's son, Sean Pawlicki, testified defendant used to "joke around" about having sex with Christina C. Sean testified when he was 13 years old, defendant made sexual comments to one of Sean's girlfriends, and that as Sean got older, defendant continued to make such comments and/or advances to Sean's girlfriends.

In 2009, defendant told Sean that he was being investigated for child molestation and that he and his then new wife were moving to the Philippines with their young

9

daughter.  With regard to the investigation, defendant told Sean that while he had been sleeping, Christina C. had "jerk[ed] him off."  Defendant also told Sean he "play[ed]" with Christina C.'s breasts, which defendant noted were "firmer" than Tammy S.'s.

B.  *Procedural Summary*

As discussed *post*, after the jury verdict defendant filed a motion to continue the probation and sentencing hearing, and when he *only* received a three-month continuance of that hearing instead of the *six months* he requested, he then moved several times for reconsideration of that order.  In denying defendant relief, the court in its March 12, 2013 order set forth the following procedural summary, which is highly relevant to the issue(s) on appeal:

"On March 8, 2013, defendant Patrick Pawlicki, filed a Second Motion for Reconsideration to allow a continuance of the sentencing date for counsel to file a motion for new trial on the ground of ineffective assistance of counsel.  For the reasons set forth below, the motion is denied.

"This matter has been lingering in the San Diego Superior Court since October of 2009.  Defendant has endeavored to delay the processing of this case at every possible stage.  His primary tools for injecting delay have been his hiring and firing of retained counsel necessitating continuances to allow counsel to prepare.

"Defendant initially retained Kerry Armstrong as his attorney in 2009, and trial was set for June 15, 2010.  Thomas Matthews was retained by defendant and substituted in for Mr. Armstrong in April 2010.  The trial date was continued to October 5, 2010.

10

Demosthenes Lorandos of Ann Arbor, Michigan, was retained, appearing for the first time on September 8, 2010.  Trial was continued to February 22, 2011.

"The case was assigned for all purposes to Department 54 on December 27, 2010.  On January 18, 2011, the February trial date was vacated and a fourth trial date was set for September 27, 2011, providing counsel fully nine months to prepare.  As the trial date approached defendant was granted another continuance until November 28, 2011 (fifth trial date).  On October 25, 2011, prior to a final status conference scheduled for October 28, 2011, Mr. Lorandos filed a motion to withdraw, based, in part, on Lorandos' claim his fee had not been paid by defendant.  Defendant failed to appear at the status conference on October 28, 2011.  The $1,000,000 bail bond was ordered forfeited and a bench warrant issued.  On October 31, 2011, the November trial date was vacated.

"Defendant was arrested outside of Atlanta, Georgia.  When he appeared in San Diego on November 15, 2011, following his extradition from Georgia, a sixth trial date was set for January 9, 2011.  At the hearing on Mr. Lorandos' motion to withdraw, defendant accused Lorandos of advising him to flee the jurisdiction at lunch prior to the status conference and further stated Mr. Lorandos was not worth the $600,000 he had been paid up to that point.  Defendant fired Mr. Lorandos.

"The court appointed the Public Defender on November 28, 2011, to represent defendant while he endeavored to hire new counsel.  On December 15, 2011, Dante Pride substituted in as retained counsel and the January trial date was vacated.  On January 9, 2012, a seventh trial date was set for June 18, 2012.  Counsel was told there would be no further continuances.  On April 2, 2012, Mr. Pride filed a motion to withdraw as counsel

11

for, among other reasons, defendant's failure to pay his fees. When defendant confirmed the failure to pay and claimed his inability to pay, the Court reappointed the Public Defender.

"The Public Defender was relieved when it was revealed that clients of the Public Defender were potential witnesses in the case against defendant. The Alternate Public Defender was appointed May 4, 2011, and confirmed May 14th. After checking for potential conflicts and finding none, an eighth trial date was set October 29, 2012. The parties were told no continuances would be granted. When defendant asked the Court if he would be allowed to hire retained counsel, the Court specifically told defendant he could hire anyone he wanted, but no continuances of the October 29th trial date would be granted to his retained counsel.

"On July 10, 2012, Raymundo Pacello filed a 'Notice of Retained Counsel' and motion to continue. The Court set a hearing for August 8, 2012, to determine if Mr. Pacello would be permitted to substitute in for the Alternate Public Defender. At the hearing the Court advised Mr. Pacello and defendant that no continuance of the case would be granted. Mr. Pacello represented to the Court he would be ready for trial and that he was an experienced trial attorney and he insisted he would be ready for trial without the need for a continuance. The Court [in]quired of Mr. Pacello about his experience in serious sex offense cases, felony jury trials and generally his qualifications to accept this case. (See, *People v. Ramirez* (2006) 39 Cal.4th 398, 424.) After this colloquy defendant was asked if he wished to substitute Mr. Pacello for the Alternate

12

Public Defender.  When defendant stated Mr. Pacello was his chosen counsel the Court allowed the substation and confirmed the trial date.

"Mr. Pacello filed a motion to continue on September 17, 2012.  The motion was heard on October 2nd, and the case was continued to November 8, 2012.  On October 19, 2012, Mr. Pacello moved to withdraw as counsel and Pamela Lacher moved to substitute in.  Both motions were denied.  Defendant was warned that his conduct as it relates to the attempts to hire and fire could be construed to constitute misconduct such that he may ultimately forfeit his right to counsel.  (*King v. Superior Court* (2003) 107 Cal.App.4th 929, 944.)

"Jury trial commenced in November of 2012.  The taking of evidence took 13 court days.  Verdicts were reached December 10, 2012, and sentencing was scheduled for January 9, 2013.

"On January 9, 2013, Ms. Lacher moved to substitute in for Mr. Pacello as retained counsel.  Defendant confirmed his desire to hire Ms. Lacher and Mr. Pacello was relieved.  The Court did not remove Mr. Pacello as counsel of record; defendant fired him and hired Ms. Lacher.

"Once Ms. Lacher was confirmed as counsel, she moved to continue the sentencing a minimum of six months.  She argued that she was planning to file a motion for new trial, mainly on the issue of ineffective assistance of counsel and she needed to review all the discovery in the case, conduct additional investigation and also required a full transcript of the trial proceedings to prepare the motion.

13

"Because Ms. Lacher stated she needed six months to review all discovery, conduct additional investigation and obtain, read and digest a transcript of the trial proceedings, the Court determined a motion for new trial was not the appropriate vehicle to determine competence of trial counsel in this case. (*People v. Cornwell* (2005) 37 Cal.4th 50, 100-101.) In appropriate circumstances, a trial court should consider a claim of ineffective assistance of counsel in a motion for new trial, because '*justice is expedited when the issue of counsel's effectiveness can be resolved promptly at the trial court level.*' (*People v. Smith* (1993) 6 Cal.4th 684, 695.) That process is appropriate where the court's own observation of the trial would supply a basis for the court to act expeditiously on the motion. (*People v. Cornwell*, *supra*, at p. 101.) In appropriate circumstances justice will be expedited by avoiding appellate review, or habeas corpus proceedings, in favor of presenting the issue of counsel's effectiveness to the trial court as the basis of a motion for new trial. If the court is able to determine the effectiveness issue on such motion, it should do so.' (*People v. Fosselman* (1983) 33 Cal.3d 572, 582-583; *People v. Cornwell*, *supra*, at p. 101.) This case does not present the situation where the issue can be decided based on the Court's observation of the trial alone.

"The issues related to the competence of defendant's <u>retained</u> attorney are issues which will require full airing in habeas corpus. This Court has no intention of holding an evidentiary hearing akin to full habeas corpus review in the context of a motion for new trial. There is no right to an evidentiary hearing in connection with a motion for new trial; the trial court has discretion to hold such a hearing. (*People v. Duran* (1996) 50

14

Cal.App.4th 103, 113.) Counsel was told that no evidentiary hearing would be held on the issue.

"Notwithstanding the Court's ruling it would not be taking evidence in connection with a motion for new trial on the competency of counsel issue, the Court granted counsel almost 3 months to prepare and file defendant's motion for new trial.

"Current counsel has been in defendant's employ at least since October 19, 2012, when she tried to substitute in as counsel of record prior to trial. She was employed by defendant when the jury reached its verdicts on December 10, 2012. At no time during the trial did counsel attempt to contract with the court reporter for a transcript of the trial proceedings. After the jury reached its verdict, Ms. Lacher did not contract with the reporter to obtain a transcript. When she substituted into the case on January 9, 2013, she did not contract with the reporter for a transcript. As of the time counsel filed her motion for reconsideration of her continuance request on January 25, 2013, she had not ordered a transcript. As of the time counsel filed her motion for reconsideration of her continuance request on January 25, 2013, she had not ordered a transcript. At the February 14, 2013, hearing on the reconsideration motion, counsel still had not ordered a transcript and claimed her funding had dried up. Testimony at trial indicated that more than $600,000 had been spent on defendant's representation, suggesting that the refusal to fund the motion for new trial was yet another attempt to manipulate and delay the proceedings in this case.

"In the instant, Second Motion for Reconsideration of counsel's continuance request, filed March 8, 2013, counsel relates she has now ordered the transcript of the

15

trial proceedings. Counsel also states she has 'barely made a dent' in her review of the case, fully 3 months after the verdict and 2 months after she formally substituted in as counsel. Counsel has not proposed a date for her motion for new trial. Based on the fact she has 'barely made a dent' in her review and the transcript of the trial has yet to be prepared, the Court anticipates a request toward the end of the year.

"[¶] . . . [¶] Trial counsel [i.e., Mr. Pacello] was not appointed by the Court; he was retained by defendant. Trial counsel was not removed by the Court; he was fired by defendant. The Court did not inquire of defendant as to the reasons for his dissatisfaction with trial counsel as defendant has the right to hire and fire anyone he chooses. [Citations.]

"Consistent with his pattern of obstructing the progress of this case, defendant retained new counsel to further delay the case by proposing to present issues more properly brought in a petition for habeas corpus in the guise of a motion for new trial. The Court granted a 3 month continuance to craft a new trial motion on those issues which would be the proper subject of a motion for new trial in this case. The Court denied the Motion to Reconsider its prior ruling and for the reasons stated in this order[,] denies defendant's second motion to reconsider."

DISCUSSION

I

*"Per Se" Ineffective Assistance of Counsel*

As noted, defendant contends his retained counsel, Raymundo Pacello Jr. (Pacello), was ineffective per se despite the fact the defense presented 14 trial witnesses and a expert in biomechanics.

A. *Additional Background*

As noted *ante*, the court on March 12, 2013 denied defendant's second motion for reconsideration of his request for additional time to investigate and prepare a new trial motion. In response, defendant on March 25, 2013 moved under Code of Civil Procedure section 170.3 to disqualify the trial judge, Honorable Louis R. Hanoian, on several grounds including: 1) the court's denial of his October 19, 2012 motion to substitute in Lacher for Pacello as counsel of record; 2) the court's refusal to give defendant's new counsel sufficient time to investigate and file a new trial motion; 3) comments made by the court that suggested defendant was improperly delaying the proceedings, which allegedly showed the court had lost its "objectivity and impartiality"; and 4) comments made by the court that Lacher was allegedly not working diligently to prepare a new trial motion on behalf of defendant. The court in its March 26, 2013 order found there were no grounds for disqualification and struck the verified statement of Lacher.[4]

---

[4] Defendant wisely has not appealed the March 26, 2013 order.

The record shows that on March 25, 2013, Lacher also moved (yet again) for a continuance of defendant's sentencing hearing. At the March 29 hearing on this motion, the record shows Pacello's former paralegal, Joshua Callington, was seated at counsel table with Lacher and defendant. On questioning by the court, Lacher noted that Callington had assisted Pacello throughout defendant's trial and that Callington was then assisting Lacher on "some of the issues relating to the motion for new trial." The court noted defendant also had filed a partial motion for new trial and a motion seeking identifying information of the jurors in his case.

With respect to the request for continuance of the sentencing hearing, the court at the March 29 hearing (again) noted that Lacher had been retained by defendant "well before" his trial ended and that she nonetheless had not ordered trial transcripts, which the court further noted anyone could order. The court also recognized, as it did in its March 12, 2013 order denying defendant's second motion for reconsideration, that Lacher had almost three months to work on and file a new trial motion on behalf of defendant, as she officially substituted into the case in early January 2013, for a case involving about 13 days of trial testimony.

The record shows Lacher in response stated that she was still waiting to receive all the trial transcripts from the reporter; that Pacello did not provide her with all the discovery; and that she needed at least another two and half months to complete her investigation and file a complete, as opposed to a partial, new trial motion.

18

In response, the prosecutor noted that at the October 19, 2012 hearing, Lacher stated on the record that she and defendant had been in discussions about her substituting into the case "weeks" before that hearing; that before Lacher sought to substitute into the case, Pacello had no idea defendant was seeking to fire him and retain new counsel; that because there was a protective order in place, Pacello was forbidden by court order to give Lacher certain discovery, including photographs; that as a result of that order, the People prepared a separate protective order for Lacher to sign to prevent any further delay in the proceedings, which Lacher signed in early to mid-January 2013; that the People had almost 8,800 pages of discovery put on a CD in mid-January 2013 and another 600 or so pages from a related case on which defendant was charged, put on a second CD[5]; and that as of March 25, 2013, Lacher had *not* picked up the CD with the 8,800 pages but had picked up the CD with the 600 or so pages. The prosecutor thus argued Lacher had not been diligent in obtaining the information she needed to complete the new trial motion and in fact suggested her "hands" were not "clean."

At the conclusion of the March 29 hearing, the court once again denied defendant's request for a continuance. The court found that Lacher had adequate time to prepare a new trial motion; that, in any event, Lacher did not need a full trial transcript because she consistently had stated her need for the trial transcripts was based on her ineffective assistance of counsel claim, which the court noted it repeatedly had found "needs to be flushed out in a full habeas corpus hearing where we can take evidence outside of what

---

5       The record shows defendant was also charged with, and plead guilty to, fleeing the jurisdiction. Defendant is not challenging that conviction in this appeal.

19

happened in front of the jury to make a determination on Mr. Pacello's actual conduct of the case and whether or not it constitutes ineffective assistance of counsel"; that even if the trial transcripts were needed, they were available after the jury reached its verdict on or about December 10, 2012; and that it appeared to the court there was some "gamesmanship" by defendant with respect to the funding to obtain such transcripts, because first Lacher represented she had the funding to obtain the transcripts and then weeks later, disclosed that funding had been pulled.

After a break, the record shows the court next heard defendant's partial new trial motion. The court stated it would hear evidence in connection with that motion, but reiterated it would *not* "take evidence from outside of the court's view" in connection with the ineffective assistance of counsel claim because the proper proceeding to consider such evidence was a habeas corpus proceeding.

Before any evidence was introduced, Lacher asked the court to make a finding that Pacello was sleeping "during a substantial portion of the trial." The court refused to make such a finding as a matter of law, noting counsel's sleeping was "something that [the court] personally did not observe." The court further noted that at no time did defendant, Callington or anyone else involved in the case alert the court to this issue during the trial.

Callington testified at the evidentiary hearing in support of defendant's new trial motion. Callington testified he sat at defense counsel's table during the entire trial. Among other duties, Callington took notes during the trial, provided a summary of his notes to Pacello at the end of each day of trial and also assisted Pacello by providing him

20

information and/or evidence for upcoming witnesses. After the jury verdict, Callington reached out to Lacher, seeking to assist her in defendant's defense.

Callington testified he observed Pacello during the trial "sleeping in court." Although Callington could not recall the number of times he saw Pacello sleeping, he estimated Pacello slept at least "three days" each week during trial, and further estimated that on the days Pacello slept, he usually did so at least three times each day. At one point during the trial, Callington told defendant to "kick" Pacello under the table to awaken Pacello.

Callington could not recall having to provide Pacello any information Pacello might have missed while allegedly sleeping. Callington also never heard Pacello snoring or making any other noises indicating that Pacello was actually sleeping, as opposed merely to listening to the proceedings with his eyes closed. According to Callington, defendant was also aware Pacello was sleeping during the trial.

Callington testified he also observed Pacello "text" messaging, using social media and sending and receiving e-mails "every day" during the trial. Callington estimated that on any given morning, Pacello spent 65 to 70 percent of his time "sleeping, texting and emailing." Callington further estimated Pacello spent between one and three minutes on his cell phone each time Pacello used it to send and/or receive test messages and/or e-mails.

Callington testified he was not currently working for Lacher, but would consider doing so if such employment was offered. He also testified he had sued Pacello, claiming he was in Pacello's employment as a "litigation paralegal," and was therefore entitled to

overtime wages. Callington sought to recover about $14,000 in unpaid wages, excluding statutory penalties.

Callington testified he never informed the court that Pacello was sleeping and/or using his cell phone to send and receive text messages and e-mail during the trial. Callington also never saw the trial court attempt to awaken Pacello while he was allegedly sleeping during the trial and he never once saw Pacello delay cross-examination and/or fail to stand up to do so because Pacello was sleeping. Callington also never saw Pacello delay in calling any of the defense's witnesses because Pacello allegedly was asleep.

Callington testified that before defendant's trial began, Pacello said he wanted to be recused from the case because Pacello had two daughters of his own and the case against defendant involved sexual misconduct. Callington admitted on cross-examination that he was placed under arrest in September 2011 for stealing chips and a soda from a grocery store, although he denied stealing those items.

On questioning by the court, Callington stated he owed a duty of loyalty to, and to perform services competently on behalf of, defendant, as opposed to Pacello.

Pacello also testified at the evidentiary hearing. Pacello then noted he had been an attorney for about 13 years; had been practicing criminal defense for about a year and a half; and had completed two criminal trials (one of which was defendant's trial). Pacello stated absent an emergency or similar circumstance, he normally would not use his cell phone to manage his law office or other affairs once trial began. Pacello used the text messaging feature on his cell phone during the trial, and potentially may have used social

22

media as a means to communicate with some of his other clients. However, Pacello testified he instructed his office not to contact him during the trial unless the matter was urgent.

Pacello testified that he never slept during the defendant's trial; that such allegations were "ludicrous"; and that he took his responsibility as a trial attorney seriously. Pacello noted at one point during the trial the court even admonished him to "tone it down" due to the vigorousness of his defense.

With regard to the use of his cell phone, Pacello testified he took calls and handled his affairs during breaks in the trial, including during the morning and afternoon recesses and during the lunch break.

With respect to Callington, Pacello testified he initially hired him to review and prepare summaries of documents. Callington also sat at counsel's table during the trial to provide Pacello with "another set of ears" to ensure nothing was missed. Pacello often consulted with Callington during the trial, including before and during cross-examination, to make sure nothing was overlooked and to help his effectiveness on cross-examination. Pacello stated defendant also continuously gave him notes during the trial and was thus an active participant in his own defense. Pacello stated to the extent he used his cell phone during the trial, it was "de minimis."

Pacello testified he was paid $9,000 to represent defendant. When Pacello learned that defendant had consulted with Lacher "behind [Pacello's] back" and that defendant's family allegedly had given her $70,000 to substitute into the case, Pacello believed a "conflict" arose because of what he termed "dirty dealing." Specifically, Pacello thought

23

it was unfair of Lacher to surreptitiously meet with defendant on the eve of trial when Pacello was actively preparing to try the case. Pacello testified he addressed this issue with the court during the October 19, 2012 hearing—in what was previously a "sealed" chambers conference—when Pacello unsuccessfully sought to withdraw as counsel of record.

Pacello further testified that during the October 19, 2012 chambers conference, he also informed the court that he had begun to question defendant's "veracity and credibility," after defendant sought to substitute Lacher into the case without first informing him, and that he began to question whether his own conscience would allow him to represent defendant under such circumstances and when defendant was accused of sexual misconduct. Pacello noted at the time he found it "very confounding" defendant and/or his family members were "cinching" on defendant's defense, including the retention of expert witnesses, while at the same time were willing to pay a new lawyer (i.e., Lacher) a substantial sum of money even before she had been substituted into the case.

With respect to his conscience and the allegations of sexual abuse against defendant, Pacello testified it did *not* affect his representation of defendant. After the court in the October 19, 2012 hearing refused to allow Pacello to withdraw from defendant's representation, Pacello testified from "that point forward, it was my duty to zealously represent my client within the bounds of the law." Pacello testified he "had a job to do" and he "did it" to the best of his ability, even after Lacher was paid money by defendant and/or his family that Pacello felt should have been paid to him.

24

Because the court at the October 19, 2012 hearing refused to continue the trial and/or to substitute in Lacher as newly retained counsel, Pacello testified he was unable to seek ancillary financing from the government to help offset the costs of defense. Nonetheless, Pacello noted that he retained an expert in the field of biomechanics who testified on behalf of the defense and that, in any event, he vigorously defended defendant.

Toward the conclusion of the evidentiary hearing, one of the jurors in defendant's case took the witness stand. The juror—No. 8—testified there were a total of six jurors from the trial in attendance at the hearing because of defendant's motion to unseal the juror's personal information. Juror No. 8 testified there was concern among some of the jurors over privacy because, before the evidentiary hearing, one juror had been contacted by a defense investigator. Juror No. 8 also testified that none of the jurors said they saw Pacello sleeping during the trial, as defendant contended.

As discussed *post*, the court denied the motion for new trial.

B. *Guiding Principles*

Ordinarily, a defendant alleging ineffective assistance of counsel " ' "must establish not only deficient performance, i.e., representation below an objective standard of reasonableness, but also resultant prejudice." ' [Citation.] Prejudice occurs only if the record demonstrates 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' [Citation.]" (*People v. Lucero* (2000) 23 Cal.4th 692, 728.) However, where counsel's conduct is so egregiously poor, prejudice may be presumed. (*United States v. Cronic* (1984) 466 U.S. 648, 661-662

25

(*Cronic*).)  The presumption of prejudice arises "if counsel *entirely* fails to subject the prosecution's case to meaningful adversarial testing. . . ." (*Id*. at p. 659, italics added.) "When a true adversarial criminal trial has been conducted—even if defense counsel may have made demonstrable errors—the kind of testing envisioned by the Sixth Amendment has occurred." (*Id.* at p. 656, fn. omitted.)

"[T]he appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such.  If counsel is a reasonably effective advocate, he meets constitutional standards irrespective of his client's evaluation of his performance. [Citation.]  It is for this reason that we attach no weight to either respondent's expression of satisfaction with counsel's performance at the time of his trial, or to his later expression of dissatisfaction." (*Cronic*, *supra*, 466 U.S. at p. 657, fn. 21.)

In *Cronic*, defendant was charged with mail fraud involving a "check kiting" scheme.  Shortly before trial, defendant's retained counsel withdrew.  The court in response appointed a "young lawyer with a real estate practice to represent respondent, but allowed him only 25 days for pretrial preparation, even though it had taken the Government over four and one-half years to investigate the case and it had reviewed thousands of documents during that investigation." (*Cronic*, *supra*, 466 U.S. at p. 649.) After defendant was convicted, he challenged the competency of trial counsel.

In reversing defendant's conviction, the court of appeals did not find defense counsel had made any specific errors or that his representation prejudiced defendant. Instead, the court of appeals rested its reversal on the ground that no such showing was necessary " 'when circumstances hamper a given lawyer's preparation of a defendant's

26

case.' " (*Cronic, supra*, 466 U.S. at p. 650.) In so doing, the court of appeals used five criteria to *infer* defendant's constitutional right to effective assistance of counsel had been violated: " ' "(1) [T]he time afforded for investigation and preparation; (2) the experience of counsel; (3) the gravity of the charge; (4) the complexity of possible defenses; and (5) the accessibility of witnesses to counsel." ' " (*Cronic, supra*, 466 U.S. at p. 652.)

The *Cronic* court reversed the court of appeals. The court concluded the court of appeals erred in utilizing an inferential approach (*Cronic, supra*, 466 U.S. at p. 653) and noted that these factors were "relevant to an evaluation of a lawyer's effectiveness in a particular case, but neither separately nor in combination [did] they provide a basis for concluding that competent counsel was not able to provide this [defendant] with the guiding hand that the Constitution guarantees" (*id.* at p. 663).

The *Cronic* court instead identified three categories of cases that constitute per se violations of the Sixth Amendment right to counsel where prejudice is presumed: (1) the "complete denial of counsel" at a critical stage in the proceedings (*Cronic, supra*, 466 U.S. at p. 659); (2) counsel's failure to "subject the prosecution's case to meaningful adversarial testing" (*ibid.*); and (3) the "likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small [under the particular circumstances] that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial" (*id.* at pp. 659-660).

In the first category (i.e., complete denial of counsel), the Court has "uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the

proceeding. [Citations.]" (*Cronic*, *supra*, 466 U.S. at p. 659, fn. 25; *Bell v. Cone* (2002) 535 U.S. 685, 695-696 (*Bell*) [noting an arraignment would constitute an example of a critical stage of a criminal proceeding where counsel cannot be denied].)

In the second category (i.e., the absence of meaningful adversarial testing), the Court has clarified that the attorney's failure must be *complete*. (*Bell*, *supra*, 535 U.S. at pp. 696-697.) Briefly in *Bell*, a capital defendant contended *Cronic* governed his ineffective assistance of counsel claim because defense counsel failed during the sentencing phase to present mitigating evidence and waived final argument. (*Id*. at p. 692.)

In rejecting this contention and reversing the court of appeals' decision to apply *Cronic*, the *Bell* court concluded that *Strickland v. Washington* (1984) 466 U.S. 668 (*Strickland*)—decided the same day as *Cronic*—governed his ineffective assistance claim: "When we spoke in *Cronic* of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, we indicated that the attorney's failure must be complete. We said 'if counsel *entirely* fails to subject the prosecution's case to meaningful adversarial testing.' *Cronic*, *supra*, 466 U.S. at 659 (emphasis added). Here, respondent's argument is not that his counsel failed to oppose the prosecution throughout the sentencing proceeding as a whole, but that his counsel failed to do so at specific points. For purposes of distinguishing between the rule of *Strickland* and that of *Cronic*, this difference is not of degree but of kind. [Footnote omitted.]

"The aspects of counsel's performance challenged by [defendant]—the failure to adduce mitigating evidence and the waiver of closing argument—are plainly of the same

28

ilk as other specific attorney errors we have held subject to *Strickland's* performance and prejudice components. In *Darden v. Wainwright*, 477 U.S. 168, 184 (1986), for example, we evaluated under *Strickland* a claim that counsel was ineffective for failing to put on any mitigating evidence at a capital sentencing hearing. In *Burger v. Kemp*, 483 U.S. 776, 788 (1987), we did the same when presented with a challenge to counsel's decision at a capital sentencing hearing not to offer any mitigating evidence at all.

"We hold, therefore, that the state court correctly identified the principles announced in *Strickland* as those governing the analysis of [defendant's] claim. Consequently, we find no merit in [defendant's] contention that the state court's adjudication was contrary to our clearly established law. [Citation.]" (*Bell*, *supra*, 535 U.S. at pp. 696-698; see *Wright v. Van Patten* (2008) 552 U.S. 120, 124 [concluding that defense counsel's decision to participate by speakerphone at a plea hearing where defendant pled guilty to first-degree reckless homicide was not tantamount to a " 'complete denial of counsel' " on par with total absence, as required for the narrow exception announced in *Cronic* to apply]; cf. *Davis v. Alaska* (1974) 415 U.S. 308, 318 [noting defendant was not required to show prejudice to establish ineffective assistance of counsel when defendant "had been 'denied the right of effective cross-examination' which ' "would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it" ' "], cited with approval in *Cronic*, *supra*, 466 U.S. at p. 659.)

In the third category (i.e., the likelihood is so small that any lawyer, even a competent one, could provide effective assistance under the circumstances), the *Cronic* court cited to *Powell v. Alabama* (1932) 287 U.S. 45 (*Powell*). (*Cronic*, *supra*, 466 U.S.

29

at pp. 659-660.)  The defendants in *Powell* were young, ignorant and illiterate.  Six days before trial in a "highly publicized capital offense" case, the trial court "appointed 'all the members of the bar' " to represent defendants.  (*Id*. at p. 660, quoting *Powell*, *supra*, 287 U.S. at pp. 55-58.)  On the day of trial, a lawyer from "Tennessee appeared on behalf of persons 'interested' in the defendants, but stated that he had not had an opportunity to prepare the case or to familiarize himself with local procedure."  (*Ibid.*)  The "problem was resolved when the court decided that the Tennessee lawyer would represent the defendants with whatever help the local bar could provide."  (*Ibid.*)

The *Powell* Court concluded defendants presumptively received ineffective assistance of counsel because "under these circumstances the likelihood that counsel could have performed as an effective adversary was so remote as to have made the trial inherently unfair."  (*Cronic*, *supra*, 466 U.S. at pp. 660-661; cf *Avery v. Alabama* (1940) 308 U.S. 444, 450-453 [noting that mere refusal to postpone a criminal trial does not give rise to a presumption of ineffectiveness and noting that appointment of counsel in a capital case only three days before trial does not create such a presumption because the circumstances of that case did not make it unreasonable to expect that counsel could be ready].)

C. *Analysis*

1. Claims Not Decided under *Cronic*

At the outset, we note defendant raised four issues in his new trial motion: 1) whether Pacello had a conflict of interest that created what defendant refers to as "an informed speculation of prejudice"; 2) whether Pacello was per se ineffective under

30

*Cronic* because Pacello was allegedly inattentive and/or sleeping during a majority of the trial; 3) whether the court erred when, shortly before trial, it refused to allow Pacello to withdraw and Lacher to substitute in as defendant's counsel of choice; and 4) whether the court erred in striking defendant's request to recuse itself for lack of impartiality.

In his opening brief on appeal, other than the issues of (i) refusing to allow Lacher to substitute into the case as defendant's retained counsel and (ii) admitting under Evidence Code section 1108 defendant's alleged commission of other sexual acts, defendant addresses all other issues from his new trial motion under the *Cronic* standard. As discussed, however, *Cronic* recognized only three *narrow* exceptions to the *Strickland* prejudice requirement.

Here, we conclude defendant raises and discusses specific instances of alleged misconduct that fall outside *Cronic* and its exception to the *Strickland* standard for evaluating an ineffective assistance of counsel claim. Specifically, we conclude the following contentions of defendant must be addressed under *Strickland*: Pacello's alleged failure to inform fully defendant and the court of his alleged lack of criminal trial experience, which defendant contends led to the admission of testimony from witnesses on cross-examination that damaged his case; Pacello's alleged lack of experience with the rules of evidence, which defendant contends led Pacello to make myriad unnecessary objections and/or ask several objectionable questions; Pacello's alleged lack of trial preparation; and Pacello's alleged conflict of interest with defendant.

Because the *Cronic* exceptions are narrow and because neither the partial motion for new trial nor the trial court nor defendant on appeal raised and/or decided these

31

specific claims under *Strickland*, we decline in this opinion to address them. Our decision in this case, therefore, is without prejudice to defendant raising such claims by way of writ of habeas corpus. (See *People v. Doolin* (2009) 45 Cal.4th 390, 417-421 [recognizing that the U.S. Supreme Court in *Mickens v. Taylor* (2002) 535 U.S. 162 "confirmed that claims of Sixth Amendment violation based on conflicts of interest are a category of ineffective assistance of counsel claims that, under [*Strickland*] generally require a defendant to show (1) counsel's deficient performance, and (2) a reasonable probability that, absent counsel's deficiencies, the result of the proceeding would have been different," and further recognizing that in situations *not* involving an attorney's representation of adverse clients, such as when appointed counsel is compensated under an agreement where counsel receives a lump sum fee that also includes costs for investigative and expert services, our own high court has "never eliminated [its] general requirement that a defendant demonstrate outcome-determinative prejudice from a violation of his [or her] state constitutional right to conflict-free counsel in order to obtain relief"].)

Our conclusion to defer a discussion of these specific claims of ineffective assistance of counsel is also supported by the fact that defendant's new trial motion allegedly was incomplete and by the court's decision to limit the introduction of evidence in connection with that motion to alleged misconduct that occurred in the courtroom (i.e., in the court's presence). (See *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266 [noting the general rule that a claim of ineffective assistance of counsel on a less than complete record is "more appropriately decided in a habeas corpus proceeding"].)

## 2. Constructive Absence of Pacello During Trial

We conclude the only issue properly before us based on *Cronic* is Pacello's alleged lack of attention to the trial, which defendant contends rendered him constructively "absent" during critical stages of the case. (See *Cronic*, *supra*, 466 U.S. at p. 659, fn. 25; see also *Javor v. United States* (9th Cir. 1984) 724 F.2d 831, 833-834 [noting no prejudice is required to support an ineffective assistance of counsel claim when an attorney for a criminal defendant "sleeps through a substantial portion of the trial"].)

Defendant contends Pacello spent a substantial period of time during trial "sleeping, texting and emailing." The record shows Pacello absolutely denied sleeping during trial, but admitted he did occasionally use his cell phone to send and receive text messages and emails he claimed required his immediate attention. The court in denying the new trial motion on this issue found as follows:

"Next issue is the question about whether or not Mr. Pacello's conduct at the trial was ineffective assistance of counsel per se. And here we get to the question about what was it that Mr. Pacello was doing during the course of the trial. Was he sleeping? Did he get a good eight hours every day while he was in court? Did he get one to three minutes [of sleep, as Callington estimated,] at a time while he was in court three times a day? Was he sleeping at all? Then for 60—60 to 65 or 65 to 70 percent of the time, I think Mr. Callington's testimony was that Mr. Pacello was doing something not associated with the case . . . ." Callington estimated Pacello spent between one and three minutes each time Pacello used his cell phone or whatever it is that people that have smart phones utilize them for. And that, in fact, he was doing something else, whether it's sleeping or texting

or going on [social media] or whatever the heck he was doing during that time, 65 to 70 percent of the time is what my notes say.

"I don't find that testimony to be credible at all. To the extent it's an observation that Mr. Pacello may have been shutting his eyes at various points during the trial, I believe that. Whether that constitutes sleeping, it certainly doesn't. People close their eyes all the time.

"[¶] . . . That he was working while his eyes were shut and so—and that's common, lots of people do that. That's the one way that some people concentrate.

"As far as using his phone 65 percent of the time, see, we have a maximum of ten minutes with his eyes shut which means out of the six hours that we were in sessions most days, six hours is 360 minutes, 70 percent of those would be somewhere around the area of almost three hours, that's way more than three hours, 4.2 hours of the time would have been done texting, [using social media], all these kinds of things, and that just didn't happen. I never observed that. I observed Mr. Pacello doing stuff on his phone on occasion. He may have been doing stuff on his phone all the time, but that doesn't mean he was not doing things that were associated with the case.

"Now, he testified that there were times where he answered an e-mail or did something with regard to an emergency. And at that time he was not doing exactly the same thing that we are expecting people to do. Here in the 21st century there is a term called multi-tasking that is utilized. It's, for example, it's where I'm looking at my notes right now while I'm issuing a ruling, and I'm doing two things at the same time, and I'm working on jury instructions while I'm listening to testimony during the trial. I do that

34

100 percent of the time. I'm multi-tasking at all times. I may be even looking at an e-mail that's coming in. I don't think that means I'm not paying attention to the case, and I don't think that that has anything to do with ineffective assistance of counsel, which is required for per se ineffective assistance of counsel.

"I do not find that Mr. Pacello was absent while he was here in court, that's not the case. I do not find that he was sleeping. He denied sleeping. I never saw sleeping. I was never advised of sleeping. And, consequently, for a factual finding in connection with this motion, I'm finding that there is no proof that he was sleeping.

"As for the texting, that's basically multi-tasking. It's something that is done by everybody. In a prior time, before electronic devices, they might have called it daydreaming. They didn't have any way of quantifying it. Of course, we have no idea anyway of quantifying it in this case because, while Mr. Callington certainly could see that Mr. Pacello might have been manipulating his phone in some way, from his vantage point he sure can't see what's on the screen. Maybe Mr. Pawlicki could have seen what was on his screen, but Mr. Pawlicki never complained about that either.

"So due to basically the facts, the court does not find those facts to be true, and the motion for new trial based upon the absence of counsel for reversible per se is also not something that will be successful."

It is axiomatic that upon appeal from the denial of a new trial motion based on a nonstatutory claim of ineffective assistance or other denial of constitutional rights, we defer to the trial court's factual findings if supported by substantial evidence, but we exercise de novo review over the ultimate issue of whether the defendant's constitutional

35

rights were violated. (*People v. Taylor* (1984) 162 Cal.App.3d 720, 724-725.) Once the court makes these factual findings, it also "should make other pertinent findings based upon its own observations and the evidence presented to it. On appeal, all presumptions favor the trial court's exercise of its power to judge the credibility of witnesses, resolve any conflicts in testimony, weigh the evidence, and draw factual inferences." (*Ibid.*)

Here, we conclude the record contains ample evidence to support the finding that Pacello was not sleeping during the trial. The court specifically found Callington's testimony on this issue was not "credible at all." The court also noted that it never observed Pacello sleeping or otherwise was made aware during the 13 days of testimony that Pacello was sleeping or otherwise inattentive, and that Pacello himself denied he was sleeping. In addition, the record shows the prosecutor never observed Pacello sleeping and juror No. 8 testified the jury did not tell defendant it saw Pacello sleeping, as alleged.

Moreover, the record supports the finding that Pacello was not "daydreaming" or otherwise using his cell phone improperly during the trial. Pacello himself testified during trial he used his cell phone "de minimis," and then to respond to clients and/or his office on exigent matters. Pacello also testified that he instructed his office not to interrupt him during the trial unless it was an emergency and that he typically responded to other clients and/or his office during breaks/recesses in the trial. We conclude this evidence supports the finding that Pacello was merely "multitasking" when he occasionally used his cell phone during the trial.

Based on these findings, which, as noted, are supported by substantial evidence in the record, we independently conclude that Pacello was not constructively absent at any point during the trial, much less at a critical point, to render his assistance to defendant ineffective per se under the first category of cases identified in *Cronic*. Because we further independently conclude neither the second nor third category of cases identified in *Cronic* apply in this case, we reject defendant's contention he received per se ineffective assistance of counsel. (See *Bell*, *supra*, 535 U.S. at pp. 696-697.)[6]

## II

### *Substitution of Counsel*

Defendant next contends the court abused its discretion and thus erred when it refused to allow Lacher to substitute in as retained counsel during the October 19, 2012 hearing, just a few weeks before trial was to commence.

Generally, a nonindigent criminal defendant has the right to discharge a retained attorney with or without cause. However, the right to discharge retained counsel is not absolute: "The trial court, in its discretion, may deny such a motion . . . if it is not timely, i.e., if it will result in 'disruption of the orderly processes of justice' [citations]. . . . [T]he 'fair opportunity' to secure counsel of choice provided by the Sixth Amendment 'is necessarily [limited by] . . . the interest in proceeding with prosecutions on an orderly and expeditious basis, taking into account the practical difficulties of "assembling the

---

[6] In light of our conclusion that none of the three categories of cases discussed in *Cronic* apply here and that defendant's other specific claims of ineffective assistance must be evaluated under *Strickland*, we deem it not only unnecessary, but *also* improper, to address in this opinion the People's alternate contention that defendant's ineffective assistance claim fails for lack of prejudice.

37

witnesses, lawyers, and jurors at the same place at the same time." ' The trial court, however, must exercise its discretion reasonably: 'a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality.' [Citation.]" (*People v. Ortiz* (1990) 51 Cal.3d 975, 983-984.)

We apply an abuse of discretion standard in reviewing an untimely motion to discharge retained counsel. (See *People v. Lara* (2001) 86 Cal.App.4th 139, 152-155.) "[D]iscretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered." (*People v. Stewart* (1985) 171 Cal.App.3d 59, 65.)

As noted *ante*, from the time this case was initially filed in October 2009 through the denial of his (partial) new trial motion, defendant was represented by 10 different attorneys. In addition, between trial continuances and defendant fleeing the state, at least eight separate trial dates were set and subsequently vacated by the court. Indeed, the court specifically found in its March 12, 2013 order denying defendant's second request for reconsideration of its order denying defendant six *months* to investigate and file a new trial motion, that defendant purposefully "endeavored to delay the processing of this case at every possible stage" and that his "primary tool[]" for doing so was his "hiring and firing" of counsel, thus necessitating myriad continuances of the trial to allow new counsel to come up to speed on the case.

The record also shows at the October 19, 2012 hearing, the court specifically asked Lacher if she was prepared to go to trial on or about November 7 or 8, 2012. Lacher responded, "No." The court therefore noted it would not allow Lacher to

38

substitute in as counsel because it would "result in a substantial delay in this case," which the court in turn found would disrupt the orderly administration of justice.

The record further shows that in August 2012, when Pacello moved to substitute into the case, the court specifically told Pacello *and* defendant that no further continuances of the trial would be granted and that trial would commence on October 29, 2012. Nonetheless, Pacello subsequently moved for a trial continuance. The court at the October 2, 2012 hearing on that motion reluctantly "granted" that request and set the trial for November 8, 2012.

At the April 2, 2013 hearing in connection with the new trial motion, the court noted that at the October 2, 2012 hearing when Pacello sought the trial continuance, defendant *then* had no objection to proceeding to trial with Pacello. The court at the April 2 hearing also noted that defendant generally had no problem speaking up, including when he was dissatisfied with his attorney(s), and that defendant on multiple occasions "spoke[] over his attorneys," even when defendant was "not supposed to be speaking."

In any event, things ostensibly changed between October 2 and October 19, 2012 when Lacher (defendant's 10th attorney) appeared at the October 19 hearing and sought to substitute in as defendant's retained counsel. As noted *ante*, not surprisingly Lacher's request was accompanied by yet *another* request to continue the trial date, which as also noted *ante*, the court denied.

The record also shows that at its core, this case was relatively straightforward, as defense counsel (i.e., Lacher) later admitted during the new trial motion. There were

39

three alleged victims—Christina C., Michael S. and Bonnie P., although Bonnie P., because of disability, could not speak (and thus testify). It was up to the jury to evaluate the credibility of the victims and the other witnesses who testified in the case, including the 14 witnesses and expert witness called by the defense, and determine whether or not defendant was guilty as charged.

On this record, we conclude there is more than sufficient evidence to support the finding that defendant intentionally delayed the processing of his case and as a result, obstructed the orderly administration of justice. Our own detailed review of the record confirms that defendant continually hired, and then subsequently "fired" (including by not paying) retained counsel shortly before trial was set to begin. This hiring and firing of retained counsel in turn led to myriad trial continuances, as also noted.

As such, we further conclude the court properly exercised its broad discretion when, at the October 19, 2012 hearing, it rejected defendant's last-minute request to substitute in Lacher as his tenth counsel of record, as doing so would have necessitated yet another trial continuance, pushed the case out more than three *years* from its original filing and further delayed the administration of justice. (See *People v. Keshishian* (2008) 162 Cal.App.4th 425, 429 [noting the right to discharge retained counsel is not absolute, the right must be balanced " 'against the disruption, if any, flowing from the substitution' " and therefore, the court did not err when it denied defendant's last-minute attempt to discharge counsel because the case had been pending for two and a half years and because myriad defense requests for trial continuances already had been granted]; cf. *Bland v. California Dept. of Corrections* (9th Cir. 1994) 20 F.3d 1469, 1475 [noting in

40

connection with a habeas petition that substitution of appointed for retained counsel should have been granted by state court when retained counsel previously had been found in contempt for failing to appear for trial and when retained counsel again failed to appear after the trial was continued, claiming he allegedly had made a calendaring "mistake," when the trial had been continued only once at the time defendant sought to substitute in appointed counsel and when the court postponed the trial for several more weeks after denying defendant's substitution request], overruled on another ground as stated in *Schell v. Witek* (9th Cir. 2000) 218 F.3d 1017, 1025.)

III

*Admission of Propensity Evidence under Evidence Code Section 1108*

Evidence Code section 1108, subdivision (a) provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101 [prohibiting the use of prior acts to prove criminal disposition], if the evidence is not inadmissible pursuant to Section 352 [as more prejudicial than probative]."

Here, the record shows the court ruled to admit and, in various instances, to exclude, under Evidence Code section 1108, subdivision (a) evidence of defendant's commission of other sexual acts. The record further shows the court did so after considering, pursuant to Evidence Code section 352, various factors including the "nature"; "relevance"; "possible remoteness"; "degree of certainty on its commission"; and the "likelihood of confusing, misleading [or] districting the jurors" with respect to such evidence.

41

Defendant initially contends that admission of character or propensity evidence to prove criminal disposition under Evidence Code section 1108, subdivision (a) violated his due process rights. Defendant raises this contention to preserve it for federal review, as he acknowledges our high court has already upheld this statute against a due process challenge. (See *People v. Falsetta* (1999) 21 Cal.4th 903, 907, 910-922 (*Falsetta*).) He also acknowledges that as an appellate court, we lack the authority to overrule our state's high court and are bound to apply the rule of law it pronounces. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

As noted, defendant also raises an equal protection challenge to the admission of uncharged prior sexual acts. Although our high court has not directly addressed this issue, it wrote favorably of an appellate decision that had rejected an equal protection challenge. (*Falsetta*, *supra*, 21 Cal.4th at p. 918 [noting *People v. Fitch* (1997) 55 Cal.App.4th 172, 184 (*Fitch*) "rejected the defendant's equal protection challenge, concluding that the Legislature reasonably could create an exception to the propensity rule for sex offenses, because of their serious nature, and because they are usually committed secretly and result in trials that are largely credibility contests" and noting *Fitch* recognized the " 'Legislature is free to address a problem one step at a time or even to apply the remedy to one area and neglect others' " (citations omitted)]; see *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1310, 1312 [rejecting defendant's equal protection challenge to Evidence Code section 1109, a statute that is similar to Evidence Code section 1108 except that section 1109 applies to prior acts of domestic violence, in part based on *Falsetta's* approval of *Fitch*].)

Because our high court in *Falsetta* cited *Fitch's* equal protection analysis favorably and because, in any event, we conclude the reasoning of *Fitch* on this issue is sound, we reject defendant's contention that Evidence Code section 1108 violated equal protection.

## DISPOSITION

The judgment of conviction is affirmed.

BENKE, Acting P. J.

WE CONCUR:

NARES, J.

McDONALD, J.

43